**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**ORLANDO DIVISION**

**FIRST VAGABONDS CHURCH OF GOD,
BRIAN NICHOLS, ORLANDO FOOD
NOT BOMBS, RYAN HUTCHISON,
BENJAMIN MARKESON, ERIC
MONTANEZ and ADAM ULRICH,**

                **Plaintiffs,**

**-vs-**                                  **Case No.  6:06-cv-1583-Orl-31KRS**

**CITY OF ORLANDO, FLORIDA,**

                **Defendant.**

_____

**MEMORANDUM OPINION AND ORDER**

On October 12, 2006, Plaintiffs filed this action against Defendant, the City of Orlando, alleging that the City's Large Group Feeding Ordinance violates the First and Fourteenth Amendments of the United States Constitution and Florida's Religious Freedom Restoration Act (the "FRFRA").[1]  Evidence was presented at a bench trial before this Court on June 23 and 24, 2008,[2] and written post-trial submissions were filed by the parties on August 8, 2008 (Docs. 82 and 83).

_____

[1]The City was granted judgement as a matter of law on the Fourteenth Amendment claims (Doc. 55) and the FRFRA claim (Doc. 79).  Accordingly, only Plaintiffs' First Amendment claims will be addressed herein.

[2]References to the transcript of this trial will be cited as "TR at [page number]."

## I.  Preface

Lake Eola lies at the heart of downtown Orlando and is surrounded by Orlando's signature park.  With its famous fountain, Lake Eola Park defines Orlando's motto, "The City Beautiful."  It is a serene haven in the midst of Orlando's bustling urban center.  It is also a place for gathering.  Whether it be families out for an evening stroll, a concert, or a political rally, Lake Eola Park is the place to be.  By the same token, it is a magnet for those wishing to express political protest.  This dispute involves the conflict between the public's right to preserve the serenity of Lake Eola Park and the First Amendment right to freedom of speech and the free exercise of religion.

## II.  The Parties

### A.  Orlando Food Not Bombs ("OFNB")

Plaintiff, Orlando Food Not Bombs ("OFNB"), is a loosely structured organization of political activists,[3] including anarchists, communists, vegans, and those generally opposed to war and violence.  Notwithstanding their diffuse political views, all OFNB members share in OFNB's core belief: that food is a right which society has a responsibility to provide to all of its members.

### B.  First Vagabonds Church of God ("FVCG")

Plaintiff, First Vagabonds Church of God ("FVCG"), is a religious congregation comprised for the most part of homeless Christians.  Pastor Brian Nichols, who himself was homeless for a time, founded FVCG in 2004 to minister to homeless Christians in downtown Orlando.

---

[3]For purposes of this Order, Orlando Food Not Bombs, Ryan Hutchison, Eric Montanez, Benjamin Markeson and Adam Ulrich will be referred to collectively as "OFNB" or the "OFNB Plaintiffs."

**C.  The City of Orlando (the "City")**

Defendant, the City of Orlando (the "City"), is a Florida municipality.  It is governed by a Mayor and a City Council comprised of six City Commissioners.  At all times pertinent hereto, Patty Sheehan was a City Commissioner representing District Four, which includes downtown Orlando.

**III. Background**

In 2005, OFNB began conducting food sharing events in Lake Eola Park once a week on Wednesdays at 5:00 p.m.  TR at 102, 177 and 180.  At these events, OFNB provided free food to hungry and homeless individuals.  At some point thereafter, the City began receiving complaints from individuals who lived or worked near Lake Eola Park.[4]  TR at 240-42.  The complaints related to the large number of homeless people that had been dispersing into their neighborhoods after the food sharing events.  TR at 242.  In response to these complaints,[5] the City Council drafted the Large Group Feeding Ordinance [hereinafter the "Ordinance"], which it presented to the public at meetings held on June 19, 2006 and June 24, 2006.  TR at 243.

---

[4]The neighborhoods closest to Lake Eola Park are referred to as the "Thornton Park neighborhood" and the "Lake Eola neighborhood" or "Lake Eola South."

[5]Some of the complaints were sent directly to Commissioner Sheehan.  On June 12, 2006, Sheehan's Assistant, Charles Smith, sent an email to eight constituents who had made complaints, informing them that an ordinance had been drafted and would be presented to the public at a meeting scheduled for June 19, 2006.  PL. EX. 3. The email stated that "the intent of this ordinance is to try to move the large groups of homeless out of downtown and create less of a 'situation' for the residents, businesses, etc. in the Lake Eola/Thornton Park neighborhoods when these groups disperse after feedings occur." *Id.*  Smith's email also stated that Sheehan was "hoping the passage of this ordinance will resolve many of the post-feeding issues that everyone's experiencing downtown." *Id.*

On June 24, 2006, the City enacted the Ordinance.[6]  The Ordinance requires anyone

conducting a "large group feeding" within the Greater Downtown Park District ("GDPD")[7] to first

---

[6]The challenged ordinance reads:

**Large Group Feeding in Parks and Park Facilities Owned or Controlled by the City in the Greater Downtown Park District (GDPD).**

Except for activities of a governmental agency within the scope of its governmental authority, or unless specifically permitted to do so by a permit or approval issued pursuant to this Chapter or by City Council:

(a)   It is unlawful to knowingly sponsor, conduct, or participate in the distribution or service of food at a large group feeding at a park or park facility owned or controlled by the City of Orlando within the boundary of the Greater Downtown Park District without a Large Group Feeding Permit issued by the City Director of Families, Parks and Recreation or his/her designee.

(b)   It is unlawful to fail to produce and display the Large Group Feeding Permit during or after a large group feeding, while still on site, to a law enforcement officer upon demand. It is an affirmative defense to this violation if the offender can later produce, to the City Prosecutor or the Court, a Large Group Feeding Permit issued to him/her, or the group, which was valid at the time of the event.

(c)   The Director of Families, Parks and Recreation or his/her designee shall issue a Large Group Feeding Permit upon application and payment of the application fee as established by the City. Not more than two (2) Large Group Feeding Permits shall be issued to the same person, group, or organization for large group feedings for the same park in the GDPD in a twelve (12) consecutive month period.

(d)   Any applicant shall have the right to appeal the denial of a Large Group Feeding Permit pursuant to appeal procedure in Section 18A.15 with written notice to the Director of Families, Parks and Recreation and with a copy to the City Clerk.

Code of the City of Orlando § 18A.09-2.

[7]The GDPD is a circular area that extends out in a two mile radius in all directions from City Hall. Code of the City of Orlando § 18A.01(24); *see also* DEF. EX. 16.

obtain a permit from the City.  Code of the City of Orlando § 18A.09-2.  "Large group feedings" are defined as events that intend to attract, actually attract, or are likely to attract twenty-five (25) or more people.  Code at § 18A.01(23).  The Ordinance limits the number of permits any person, group or organization can receive to two per park within a twelve-month period.  Code at § 18A.09-2(c).

Following the passage of the Ordinance, the OFNB Plaintiffs attempted to re-locate their food sharing events to nearby locations that would be in compliance with the Ordinance, without sacrificing visibility or having to limit their events to twice per year.  *See* TR at 181-83.  These efforts proved futile, however, because officers with the Orlando Police Department informed OFNB members that the Ordinance applied to areas adjacent to downtown parks as well as the parks themselves, and in fact arrested OFNB member Eric Montanez for violating the Ordinance.[8] TR at 181-82 and 199-200.

The Ordinance has also placed a significant burden on Pastor Nichols and FVCG. Currently, FVCG's congregation has approximately forty members.  TR at 29.  Nichols holds services every Sunday at 1:00 p.m. in Langford Park, which is located within the GDPD.  TR at 30-31.  The services consist of songs, prayer, Bible readings and food sharing.  *Id.*  The breaking of bread amongst the members of Nichols' congregation is a Christian tradition and an integral part of Nichols' ministry.  TR at 31.

After trying out several less suitable locations, Nichols chose to hold his services in Langford Park because it is located in a serene setting and is equipped with a pavilion, grill,

---

[8]Mr. Montanez was acquitted of this charge after a jury trial.  TR at 200.

-5-

potable water and restrooms.[9]   TR at 32.  Langford Park is also located adjacent to public

transportation.  TR at 32-33.  The location and amenities offered by Langford Park make it ideal

for the conduct of Nichols' services.  Although there have been no credible complaints about

Nichols' use of Langford Park, in order to comply with the Ordinance, Nichols will either have to

limit his services to twice per year, rotate them to other parks within the GDPD, or move them to a

park outside of the GDPD.[10]

## IV. Legal Analysis

### A.  Count IV: Free Speech

The analysis of this claim begins with a determination of whether OFNB's food sharing

events are protected as "expressive conduct" under the First Amendment.

> In deciding whether particular conduct possesses sufficient communicative elements to
> bring the First Amendment into play, we have asked whether an intent to convey a
> particularized message was present, and whether the likelihood was great that the message
> would be understood by those who viewed it.

*Texas v. Johnson*, 491 U.S. 397, 404 (1989) (internal quotation marks omitted).  "[I]t is the

obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the

First Amendment even applies."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5

(1984).

---

[9]Langford Park is a heavily-wooded, relatively isolated park located to the east of downtown Orlando.

[10]The City suggests another alternative: that Plaintiffs hold their services at Sylvia Lane, which is located within the same area as the GDPD, but is not a park. Sylvia Lane is a former parking lot, under an expressway, enclosed by a chain link fence with barbed wire at the top and offers no amenities except tables and portable toilets. *See* PL. EX. 4. This alternative is entirely unacceptable to Plaintiffs, and to this Court as well.

First, OFNB Plaintiffs assert that, by holding these food sharing events, they intend to convey the message that society can and should provide food for all of its members, regardless of wealth. The City argues that the message the OFNB Plaintiffs intend to convey is not particularized because each of the witnesses described their intended message in slightly different terms. However, these minor differences do not undercut the fact that all the members of OFNB described the same basic substantive message. Therefore, the Plaintiffs have sufficiently established the intent prong of the *Johnson* test.

Next, the City argues that Plaintiffs' message is not likely to be understood by those who view their conduct. This argument, however, is undercut by the testimony of Orlando's Mayor, Buddy Dyer, who stated that he believed that OFNB provided food to the homeless only to convey their political message – not necessarily to help the homeless.  TR at 230-31. Furthermore, in a video presented by Plaintiffs, an Orlando Police Officer noted that he realized that the feeding was being held mainly for political purposes. PL. EX. 5.  Finally, the testimony at trial established that the likelihood of the OFNB Plaintiffs' message being received is enhanced by their use of signs, T-shirts and buttons.  TR at 190-91.  Therefore, the Court finds that the OFNB Plaintiffs are conveying a message that is likely to be, and is in fact being, understood by the public and that the group feedings held by OFNB qualify as expressive conduct under the First Amendment.

Next, the Court turns to the issue of whether the Ordinance is constitutional.

In evaluating the constitutionality of an ordinance restraining or regulating speech, "we first inquire whether the Ordinance is content-neutral."  *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2005); *see also One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1286 (11th Cir. 1999). . . .  The Supreme Court has articulated and applied various standards for determining whether a law is content based or content neutral. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner,*

> 512 U.S. at 643. On the other hand, a content-neutral ordinance is one that "places no
> restrictions on ... either a particular viewpoint or any subject matter that may be discussed."
> *Hill v. Colorado*, 530 U.S. 703, 723, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000); *see also*
> *Burk*, 365 F.3d at 1254 (A content-neutral ordinance "applies equally to all, and not just to
> those with a particular message or subject matter in mind.").

*Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258-59 (11th Cir. 2005).

On its face, the Ordinance applies equally to all large groups who share food in downtown parks, regardless of whether the groups are engaging in expressive conduct.  While the Ordinance clearly appears to have been passed with the intent of limiting, or even eliminating, the expressive conduct of OFNB at Lake Eola Park, political motives are not necessarily unconstitutional. Moreover, there is no evidence that the City adopted the Ordinance because it disagrees with OFNB's message.  In fact, the testimony of Mayor Dyer established that the City has made commendable efforts to provide food and social services to Orlando's homeless and hungry population.  Accordingly, the Court finds that the Ordinance is content-neutral and must now determine whether the Ordinance is adequately supported by an important governmental interest.

> [The Supreme] Court has held that when "speech" and "nonspeech" elements are combined
> in the same course of conduct, a sufficiently important governmental interest in regulating
> the nonspeech element can justify incidental limitations on First Amendment freedoms. To
> characterize the quality of the governmental interest which must appear, the Court has
> employed a variety of descriptive terms: compelling; substantial; subordinating;
> paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear
> that a government regulation is sufficiently justified if it is within the constitutional power
> of the Government; if it furthers an important or substantial governmental interest; if the
> governmental interest is unrelated to the suppression of free expression; and if the
> incidental restriction on alleged First Amendment freedoms is no greater than is essential
> to the furtherance of that interest.

*United States v. O'Brien*, 391 U.S. 367, 376-77 (1968) (internal footnotes omitted).

The Ordinance clearly affects OFNB's effort to convey its political message.  Thus, the question becomes whether the Ordinance furthers a substantial governmental interest and whether

-8-

the incidental restriction on OFNB's First Amendment freedoms is no greater than is essential to further that interest.

In support of the Ordinance, the City professes three concerns: (1) public safety (in particular, crime); (2) public health (litter and excess garbage); and (3) overuse of the City's parks (including crowding and access issues).

With respect to public safety, the City presented evidence at trial that crime in downtown Orlando increased slightly from 2005 to 2006. TR at 183. However, the City made no showing that any of this crime was related to large group feedings. For example, there was no evidence presented of crimes committed on the days of the feedings, in the immediate vicinity of the feedings or by people who participated in the feedings. Furthermore, there is absolutely no evidence of crimes being committed during the feedings. Moreover, even if there was a connection between the feedings and crime, there is no evidence that moving the feedings to different parks around the City would lessen the amount of crime.

Similarly, there was no evidence presented that there is any problem with littering or garbage in the parks, let alone one connected to group feedings. In fact, the evidence presented shows that OFNB does not use disposable items at their events, that they clean up when they are done and that they leave the park cleaner than it was when they arrived. TR at 197-98. The City also argues that, even if litter is not left on the ground, group feedings in the park result in more garbage which must be collected by the City. TR at 378. Again, there is no evidence that the amount of garbage to be collected has increased as a result of large group feedings. Furthermore, even if there were an increase in garbage, moving the feedings from one park to another does nothing to lessen the garbage collection burden placed on the City.

-9-

Finally, as to the City's desire to prevent crowding, there is no evidence that the parks in

the GDPD are being overused.[11]  Furthermore, this Ordinance does not ameliorate overuse.  For

example, nothing in the Ordinance limits the size of the groups or prevents 25 different groups

from receiving permits to hold large group feedings at the same time, on a single day, and at the

same park.  Nor does the Ordinance do anything to prevent a different group from holding a large

group feeding in any given park on every day of the year.  Instead, the *only* reason that a person

may be denied a large group feeding permit is if he has already received two permits for that park

within the previous 12-month period.

This brings us then to the final and perhaps real, though unstated, reason for the City's

adoption of this ordinance:  re-distributing the putatively negative socio-economic effects of the

homeless dispersing into surrounding neighborhoods after food sharing events; in short,

discouraging the homeless from congregating in downtown Orlando, and more particularly, the

Thornton Park and Lake Eola neighborhoods.  As stated by Mayor Dyer, it is an effort to spread

the impact of large group feedings among Orlando's parks.  TR at 244-46.

While the City clearly has the right to regulate the use of its parks, this Ordinance does not

do so.  It does not limit the number or size of groups using a park at a particular time; nor does it

regulate their activities (e.g., noise), require litter controls, or enhance public safety.  Even if the

expressed concerns were genuine, existing ordinances – which do not place restrictions on First

---

[11]Lisa Early, the director of Families, Parks and Recreation for the City of Orlando, testified
that there has been an overall increase in park usage from 2005 through 2007.  TR at 337, 344 and
349.  However, neither Ms. Early nor the City offered any credible evidence of overuse.

Amendment freedoms – already provide protection for the public.  In short, whatever problems may exist, this Ordinance does nothing but move them around to be shared by other parks.

Rather than address the problem of homelessness in these downtown neighborhoods directly, the City has instead decided to limit the expressive activity which attracts the homeless to these neighborhoods.  While the Ordinance may very well accomplish the goal of diminishing the number of homeless in the Thornton Park and Lake Eola neighborhoods, the restriction clearly prevents OFNB from communicating its Constitutionally protected speech at a meaningful location which, from time immemorial, has been the traditional public forum for free speech. Although some incidental restrictions on First Amendment freedoms must be tolerated, the Court concludes that the restriction here goes too far.

In sum, there is no evidence that the Ordinance furthers a substantial governmental interest. Even assuming that the Ordinance did further a substantial governmental interest, the restrictions placed on First Amendment freedoms are much greater than that which are essential.  Accordingly, the Ordinance violates Plaintiffs' right to free speech under the First Amendment.

**B. Count II: Free Exercise of Religion**[12]

The City argues that because this Court found that the Ordinance does not violate the

FRFRA, it must also conclude that it does not violate the Free Exercise clause of the First

Amendment.[13]

It is true that the FRFRA provides protection to a greater number of activities than the First

Amendment. *See Warner v. City of Boca Raton*, 887 So. 2d 1023, 1032 (Fla. 2004).  However, it

does not necessarily follow, as the City suggests, that "a determination that the ordinance does not

violate FRFRA mandates a further determination that the ordinance does not violate the Free

Exercise Clause." (Doc. 82 at 4).

Here, there is no question that the activity involved falls within the protection of both the

FRFRA and the Free Exercise Clause.  However, this Court held that Plaintiffs have failed to show

that the Ordinance places a "substantial burden" on this activity as defined under the FRFRA. To

succeed on their First Amendment claim, however, Plaintiffs are not required to show that the

Ordinance places a "substantial burden" on the exercise of their religion.  Rather, the Court must

independently evaluate the First Amendment claim.  *See Warner v. City of Boca Raton,* 420 F.3d

1308, 1310 (11th Cir. 2005).

> In addressing the constitutional protection for free exercise of religion, our cases establish
> the general proposition that a law that is neutral and of general applicability need not be
> justified by a compelling governmental interest even if the law has the incidental effect of

---

[12]This Count is asserted only by Pastor Nichols and FVCG.

[13]The City relies on *Men of Destiny Ministries, Inc. v. Osceola County*, 20 Fla. L. Weekly Fed. D 314, an Order issued by this Court on November 6, 2006.  Upon review, it appears that this Court's analysis in *Men of Destiny* relied on the finding that there was a rational basis for the statute in question.

burdening a particular religious practice. *Employment Div., Dept. Of Human Res. of Ore. v. Smith*, *supra*.

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) [hereinafter "*Lukumi*"].  Since the Ordinance is content neutral, the rational basis test will be applied to determine whether the ordinance is constitutional. "Under this test, a rationally based, neutral law of general applicability does not violate the right to free exercise of religion even though the law incidentally burdens a particular religious belief or practice." *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (citing, *inter alia*, *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)).

The Court finds that there is no rational basis for this Ordinance.  None of the legitimate government interests proffered by the City are served by this Ordinance.  Furthermore, as this Court found in its Order on Defendant's Rule 52 motion, the Ordinance does much more than incidentally burden Nichols' congregation. (*See* Doc. 79 at 4).  Therefore, the Court finds that the application of this Ordinance violates the First Amendment rights of Nichols and FVCG.

### C.  Count IV: Freedom of Assembly

All Plaintiffs argue that the Ordinance violates their right to freely assemble.[14]

The right to assemble is protected by the First Amendment to the United States Constitution.  Restrictions of this right are proper only when they relate to the time, place, or manner of the assembly and "are narrowly tailored to serve significant governmental interests and leave open ample alternative channels of communication." *See Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523 (11th Cir. 1985).

---

[14]As stated previously by this Court, both parties have also referred to the right to expressive association throughout this litigation. (Doc. 55 at 7 n.7).  However, this right is not mentioned in the Complaint and has not been briefed by Plaintiffs in their trial brief. Thus, it appears that Plaintiffs are not pursuing such a claim.

*Fla. State Conf. of NAACP Branches v. City of Daytona Beach*, 54 F. Supp. 2d 1283, 1288 (M.D. Fla. 1999).

Plaintiffs, however, have failed to demonstrate that the Ordinance implicates the right to assemble. Under the terms of the Ordinance, Plaintiffs are free to assemble so long as they do not serve food.  Thus, the Court finds that the City is entitled to judgment in its favor on Count IV.

**V. Conclusion**

For the foregoing reasons, the Court finds in favor of Plaintiffs on Counts II and III. Therefore, it is

**ORDERED** that Judgment shall be entered in favor of Defendant on Counts I, IV, V and VI and in favor of Plaintiffs on Counts II and III.  The City of Orlando is hereby **PERMANENTLY ENJOINED** from enforcing the Large Group Feeding Ordinance, Code of the City of Orlando § 18A.09-2, against Plaintiffs.  The Clerk of the Court is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 26, 2008.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE